Shane P. Coleman
Daniel W. Beierwaltes
BILLSTEIN, MONSON & SMALL PLLC
1555 Campus Drive, Suite 201
Billings, MT 59102
Telephone: 406.656.6551
shane@bmslawmt.com
daniel@bmslawmt.com

ATTORNEYS FOR PLAINTIFFS
MATT AND RACHEL DUSEK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| MATT DUSEK and RACHEL DUSEK, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT AND JURY DEMAND** |
| SCOTT DARKENWALD; TRACY ROSSI; and NEW T & B MT WEST, LLC, dba "GLACIER SOTHEBY'S INTERNATIONAL REALTY," | |
| Defendants. | |

Plaintiffs Matt and Rachel Dusek, for their Complaint against Defendants

Scott Darkenwald, Tracy Rossi, and New T & B MT West LLC, dba "Glacier

Sotheby's International Realty," by and through their undersigned counsel of

record, state and allege as follows:

## PARTIES

1.      Plaintiffs Matt and Rachel Dusek ("Plaintiffs" or the "Duseks") are citizens and residents of California.

2.      Defendant Scott Darkenwald (or "Darkenwald") is a citizen and resident of Flathead County, Montana.

3.      Defendant Tracy Rossi ("Rossi") is a citizen and resident of Flathead County, Montana.

4.      Defendant New T & B MT West, LLC, dba "Glacier Sotheby's International Realty," ("Glacier Sotheby's") is a citizen of the States of Idaho and Washington by virtue of the citizenship of its members.

## JURISDICTION AND VENUE

5.      Jurisdiction is properly before this Court pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds the jurisdictional minimum of $75,000.

6.      The venue of this matter is properly placed in Montana and in the Missoula Division, because the Defendants Darkenwald and Rossi reside in Flathead County, Montana, and because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Flathead County, Montana.

## ALLEGATIONS COMMON TO ALL COUNTS

7.      Darkenwald and Rossi are licensed real estate brokers who do business in Flathead County, Montana for Defendant Glacier Sotheby's.

8.     At all times relevant to this Complaint, Darkenwald and Rossi were acting within the scope and course of their job duties at Glacier Sotheby's.

9.     On or about September 2, 2021, Darkenwald and others in his office, including Rossi, were engaged as the selling agents on behalf of Gail Goodwin and Darryl Slattengren for certain property located at 348 Grist Road, West Glacier, Montana, and thereafter proceeded to advertise the property for sale via the internet and otherwise.

10.     The Duseks were referred to Darkenwald and Glacier Sotheby's for advice and consultation in connection with potentially purchasing property in Flathead County, Montana, due to their extensive experience with high-end properties in the area.

11.     On or about September 30, 2021, the Duseks contacted Glacier Sotheby's to obtain information about the property listed for sale by Goodwin and Slattengren, and Darkenwald later responded to their inquiry.

12.     On or about October 4, 2021, the Duseks and Darkenwald signed a dual agent agreement, whereby Darkenwald, Rossi, and Glacier Sotheby's International Realty agreed to act as both the Duseks' real estate broker and the sellers' real estate broker in connection with a potential purchase and sale of the property.

13.    In consultation with Darkenwald, on or about October 5, 2021, the Duseks made a written purchase offer for the property in the amount of $9 million in the form of a written Buy-Sell Agreement. Thereafter, Darkenwald informed the Duseks that their $9 million offer was rejected by the sellers. Neither Darkenwald nor Rossi presented this $9 million offer to the sellers in writing.

14.    After further consultation with Darkenwald, on or about October 5, 2021, the Duseks submitted to Defendants a second written purchase offer in the amount of $10 million in the form of a written Buy-Sell Agreement.

15.    The Buy-Sell Agreement is a form document prepared by the Montana Association of Realtors. Darkenwald and Rossi added their own language to the Buy-Sell Agreement regarding the Duseks' contingencies.

16.    At the time the Duseks' offers were made, the Duseks had not yet personally visited the property. This was due, in part, to travel constraints related to the Covid-19 pandemic.

17.    While the Duseks were interested in the property, they were wary of making an offer sight-unseen for such a substantial purchase price. Through consultation with the Defendants, the Duseks were assured that they would have the opportunity to personally visit the property and that the terms of any purchase offer would need to include contingencies that would permit the Duseks to

terminate any sales transaction if the property was not to their satisfaction, upon their in-person visitation.

18.    Darkenwald assured the Duseks that the in-person visitation contingency language of the form Buy-Sell Agreement would allow the Duseks to terminate the transaction if the property did not meet their approval upon visiting the property.

19.    Defendants also assured the Duseks that they would have the opportunity to hire a professional property inspection company to assess the condition of the property and that any purchase would be contingent upon the property meeting their expectations after review of a report by the property inspection company.

20.    The property uses a private well for water. In October of 2021, the Duseks were aware of difficulties related to property water rights in Montana and wanted to be certain that this property had undisputed and durable water rights associated with it. The Duseks consulted the Defendants about these concerns, and the Defendants assured the Duseks that the purchase and sale agreement would be drafted to ensure that the property would have sufficient, permanent water rights and a satisfactory well log.

21.    Even before the Duseks signed the Buy-Sell Agreement, they discussed with Darkenwald their concern that the property not have issues with

mold, and Darkenwald assured the Duseks that he would include language in the Buy-Sell Agreement that allowed them to cancel the transaction if the property did have mold.

22.    Darkenwald and Rossi also added their own language to the Buy-Sell Agreement to address the Duseks' concerns.

23.    Darkenwald and Rossi added language to the form Buy-Sell Agreement that they assured the Duseks would give them the absolute right to terminate the transaction for any reason, without penalty, if the property did not meet their expectations when they were finally able to personally visit it. Darkenwald and Rossi assured the Duseks that the language they added to the form Buy-Sell Agreement would give the Duseks the absolute right to terminate the transaction for any reason, without penalty, if the property failed to meet their expectations when Duseks were finally able to make a personal visit.

24.    Defendants' assurances concerning the personal visitation contingency were material to the Duseks' decision to execute the Buy-Sell Agreement offer, because they had not yet seen the property in person. As an inducement to persuade the Duseks to sign the Buy-Sell Agreement without having seen the property, Darkenwald stated that the Duseks could terminate the Buy-Sell Agreement for any reason at all upon visiting it, including even "if the wind blows wrong across the property."

25.     Darkenwald and Rossi also drafted language for a new contingency related to the water rights and well permitting for the property. Darkenwald assured the Duseks that the water rights contingency that he added would allow the Duseks to terminate the Buy-Sell Agreement if the property did not have sufficient, durable water rights.

26.     In reliance on Darkenwald's representations, the Duseks signed the Buy-Sell Agreement offer.

27.     On or about October 5, 2021, the sellers accepted the Duseks' offer and agreed to sell the property for $10 million, subject to the terms and contingencies added to the Buy-Sell Agreement by Darkenwald and Rossi.

28.     Thereafter, at Darkenwald's recommendation, the Duseks hired Quinn Construction Company to perform the property inspection.

29.     On October 13, 2021, Kelly Quinn of Quinn Construction Company issued the Duseks a property inspection report, following his inspection of the property.

30.     Upon receiving the property inspection report, the Duseks could have terminated the Buy-Sell and received back their earnest money, based upon the standard terms of the Montana form Buy-Sell Agreement. Alternatively, the Duseks could have demanded that the sellers address property conditions that did not meet the Duseks' expectations.

31.    The Duseks reviewed the inspection report with Darkenwald.

32.    Based on that discussion, Darkenwald and Rossi prepared a document entitled "Inspection Notice" that itemized matters that the Duseks required be resolved before closing on the purchase of the property.

33.    When Darkenwald and Rossi drafted the Inspection Notice and presented it to the Duseks, the Duseks had not yet visited the property, but were actively working with Darkenwald to schedule their visit.

34.    When he presented the Duseks with the draft Inspection Notice, Darkenwald did not explain his belief that the Duseks would be waiving their personal visitation contingency rights by signing the Inspection Notice.

35.    One of the items on the Inspection Notice involved the remediation of mold that was noted in the inspection report. Kelly Quinn's visual inspection noted significant amounts of black mold on the property. Kelly Quinn recommended contacting a qualified mold remediation contractor for further evaluation.

36.    Defendants drafted language in the Inspection Notice that required the property to pass a mold clearance test as a condition to closing the transaction.

37.    Defendants assured the Duseks that the language they drafted for the Inspection Notice would allow the Duseks to terminate the Buy-Sell Agreement if the remediation measures, including the mold remediation, were not completed to their satisfaction.

38.     Darkenwald assured the Duseks that the language he drafted for the Inspection Notice would allow the Duseks to terminate the Buy-Sell Agreement if the property did not pass a mold clearance test following remediation.

39.     In reliance on Darkenwald's representations, the Duseks signed the Inspection Notice on October 15, 2021, and allowed Darkenwald to send it to the sellers.

40.     On October 17, 2021, the sellers countersigned the Inspection Notice, agreeing to the terms drafted by Darkenwald.

41.     Also on October 17, 2021, Defendants received from the sellers, for the first time, the owners "Property Disclosure Statement," which simply indicated that the sellers had no knowledge of any property issues "other than the items in the inspection report."

42.     The sellers had previously received the blank Property Disclosure Statement, but apparently had not returned the completed form to Defendants. On October 16, 2021 – after receiving the Dusek's Inspection Notice, Defendants resent the blank Property Disclosure Statement to sellers and encouraged sellers to then report that they had knowledge of what was sent to them "in the inspection notice."

43.     On October 17, 2021, the sellers also completed the Defendants' "Seller Agent" portion of the Property Disclosure Statement for Defendants.

Defendants did not ever prepare or sign a Property Disclosure Statement for the property.

44.    On October 18, 2021, Darkenwald forwarded the sellers' Property Disclosure Statement with a note acknowledging that the sellers deliberately delayed providing their Property Disclosure Statement, because they were "holding off sending it until the water rights were resolved."

45.    Darkenwald helped arrange for the Duseks to personally visit the property on October 19, 2021. Darkenwald never indicated that the visit should have occurred prior to the submission of the Inspection Notice for it to have any meaning in terms of identifying any objectionable property conditions.

46.    Thereafter, the sellers hired Cory Rensmon of Advanced Restoration to remedy the issues raised by the Inspection Notice.

47.    Upon completion of the sellers' remediation efforts, the Duseks hired Kelly Quinn to perform a general reinspection of the property.

48.    Advanced Restoration hired a certified mold inspector, David Quinn (Kelly's father), to test for mold. The mold testing procedure used by David Quinn involved taking air and surface samples in the property and sending the test media to a laboratory in Arizona for testing, because the property was required to pass a clearance test.

49.    While the Duseks received the results of the mold testing, Darkenwald confirmed for the Duseks that their contingencies to the Buy-Sell Agreement remained in effect, awaiting only the results of that mold testing. By text message dated October 25, 2021, Darkenwald informed Matt Dusek, "We should have the inspection results all done by tomorrow late afternoon. That would wrap up your contingencies if all is well."

50.    The Duseks received David Quinn's mold report October 27, 2021.

51.    David Quinn's mold report with independent laboratory test results indicated that mold and moisture remained in the residence on the property even after the remediation efforts by Cory Rensmon of Advanced Restoration. Specifically, the mold report showed elevated levels of certain types of mold spores. The mold report also showed higher levels of certain spores inside the residence as compared with background levels outside the residence, which indicated that the mold source was inside the residence.

52.    On October 28, 2021, Defendants asked the Duseks to release their contingencies to the Buy-Sell Agreement. Tracy Rossi sent the Duseks a document entitled "Notice of Release of Contingencies." The release document provided that, "as of 10/28/2021," the Duseks would release all outstanding contingencies, which then included the "inspection contingency & remedies," the "personal visit," and the "well & water rights contingencies."

53.     Throughout their relationship, the Duseks repeatedly discussed with Darkenwald the importance of the contingencies to the Buy-Sell Agreement, and Darkenwald led the Duseks to understand that the Buy-Sell Agreement would automatically terminate if the Duseks did not affirmatively release the contingencies.

54.     Based on communications with Darkenwald, the Duseks reasonably believed that the property condition contingency, the personal visitation contingency, and the well permitting and water rights contingencies remained in effect as of October 28, 2021, and that their affirmative, written agreement was required to release these contingencies.

55.     The Duseks declined to sign the Notice of Release of Contingencies, as requested by Defendants. Instead, on October 30, 2021, the Duseks sent written notice to Darkenwald terminating the Buy-Sell Agreement.

56.     As a dual agent representing both the sellers and the buyers in this transaction, Darkenwald learned, or reasonably should have learned, that the Duseks and the sellers had different understandings of the contingency language in the Buy-Sell Agreement that he prepared with Rossi.

57.     Throughout the period of Defendants' dual-agency representation of both the Duseks and the sellers, Defendants had actual knowledge that the Duseks

and the sellers had materially different interpretations of how the contingency dates of the Buy-Sell Agreement operated.

58.    In the days immediately preceding the Duseks' termination of the Buy-Sell Agreement, the sellers informed Darkenwald that they believed the Duseks' contingencies ended automatically, on a certain date, unless the Duseks affirmatively terminated the Buy-Sell Agreement before that date. On October 27, 2021, the sellers told Darkenwald that their understanding was that the Duseks "would have to object and withdraw the offer by the end of this today anyway, as it goes hard per the agreement tomorrow."

59.    The Duseks' understanding of the contingency dates drafted by Defendants in the Buy-Sell Agreement was entirely different than the understanding expressed by the sellers, and the Defendants knew this.

60.    Defendants privately went along with the sellers' interpretation of the contingency release date. As 5:00 p.m. approached on October 29, 2021 – the date and time when the sellers believed the contingencies automatically released – Darkenwald was in constant communication with the sellers about the supposed contingency release.

61.    At that time, Darkenwald was waiting to receive the Duseks' signed Release of Contingencies. Darkenwald never contacted the Duseks to inform them of the sellers' contrary interpretation that the contingencies would release

automatically or to inform the Duseks that Darkenwald had told the sellers that he agreed with their contrary interpretation of the contingency release date.

62.    Darkenwald did not inform the sellers that the Duseks had a materially different understanding of the contingency termination deadline. Instead, in response to the sellers' comments on October 28, 2021, Darkenwald responded that the Duseks were "not going to withdraw the offer." That explanation satisfied the sellers, who responded simply, "Yay!"

63.    Darkenwald did not inform the Duseks that the sellers had a materially different understanding of the contingency termination deadlines in the Buy-Sell Agreement. Darkenwald did not inform the Duseks that the sellers believed the contingencies automatically expired on October 29, 2021.

64.    Instead, on October 28, 2021, Darkenwald and Rossi sent the Duseks the Notice of Release of Contingencies and asked the Duseks to sign it, consistent with the Duseks' understanding that their affirmative release was required and consistent with the language of the Buy-Sell Agreement. Specifically, Darkenwald and Rossi asked the Duseks on October 28, 2021, to agree that:

> The following contingency (ies) is/are released, satisfied, or waived as of the date indicated below, and is/are of no further force and effect.
>
> All contingencies in the buy-sell dated 10/4/2021 are released including inspection contingency & remedies, title contingency, insurance contingency, corner pins, personal visit and well &

> water rights contingencies have all been satisfied & released as of 10/28/2021.
>
> Earnest money is now non-refundable as long as seller performs the buy-sell dated 10/4/2021.

65.    The Duseks reasonably believed that their signature on the October 28, 2021 Notice of Release of Contingencies sent by Darkenwald and Rossi was required to release their contingencies under the Buy-Sell Agreement.

66.    When Darkenwald and Rossi sent the Duseks the Notice of Release of Contingencies on October 28, 2021, neither of them told the Duseks that they believed the Notice of Release of Contingencies was superfluous and that the Duseks' contingencies would release automatically the following day.

67.    After the Duseks terminated the Buy-Sell Agreement, the sellers demanded that the Duseks proceed to closing the transaction for the purchase of the property and thereafter filed litigation to specifically enforce the Buy-Sell Agreement.

68.    On January 17, 2023, the Missoula Federal Court entered an Order granting summary judgment in favor of the sellers, and thereafter directed the Duseks to specifically perform the Buy-Sell Agreement by purchasing the property.

69.    As a result of the Defendants' negligent conduct described herein, the Duseks have incurred significant damages, including legal fees and expenses in

defending the Missoula Federal Court litigation and the potential losses related to possibly being ordered to purchase a home with mold problems, if the court's summary judgment order is upheld on appeal.

## COUNT 1 - NEGLIGENCE

70.    Plaintiffs incorporate the allegations of all preceding paragraphs as though set forth fully herein.

71.    Defendants owed the Duseks a duty to use reasonable care in connection with the contemplated real estate transaction.

72.    Defendants owed the Duseks the duties enumerated under Mont. Code Ann. §37-51-313, particularly including the obligation to act at least equally in the Duseks' best interests, to obey promptly and efficiently instructions from the Duseks, to disclose relevant and material information not known to the Duseks, to safeguard the Duseks' confidences, and to exercise reasonable care, skill, and diligence in pursuing the Duseks' objectives and complying with the terms of the Buy-Sell Agreement.

73.    Defendants failed to meet these obligations and thereby breached their duties owing to the Duseks.

74.    As a direct and proximate cause of Defendants' breaches of their duties, the Duseks have incurred damages in an amount to be determined at trial.

## COUNT 2 – NEGLIGENT MISREPRESENTATION

75.     Plaintiffs incorporate the allegations of all preceding paragraphs as though set forth fully herein.

76.     Defendants represented to the Duseks that the contingency language drafted in the Buy-Sell Agreement and related documents was sufficient to allow the Duseks to terminate the Contract if the property did not meet their expectations.

77.     After signing the Buy-Sell Agreement, Defendants continued to represent to the Duseks that their contingencies remained in effect until the mold was fully remediated and passed a clearance test.

78.     After signing the Buy-Sell Agreement, Defendants represented to the Duseks that their contingencies remained in effect until they affirmatively signed the "Notice of Release of Contingencies" document that Darkenwald's office sent to the Duseks.

79.     Defendants' representations were false, and Defendants had no reason to believe they were true.

80.     Defendants did not, in fact, believe that the Duseks' contingencies remained in effect or that the language of the Buy-Sell Agreement was sufficient to permit the Duseks to terminate the Buy-Sell Agreement at the time that the Duseks determined the need to terminate the contract.

81.     Defendants' representations were made with the intent of inducing Plaintiffs to sign the Buy-Sell Agreement and to proceed toward closing the purchase under the Buy-Sell Agreement, rather than to fully and fairly represent the Duseks and their need to be comfortable with the property before timely releasing their option to terminate the Buy-Sell Agreement.

82.     The Duseks trusted Defendants implicitly and were unaware of the falsity of Defendants' statements.

83.     As a result of Defendants' misrepresentations, the Duseks incurred damages in an amount to be proven at trial.

84.     Based on representations from Darkenwald, the Duseks reasonably believed that the Buy-Sell Agreement would terminate if they had identified problems with the property condition, such as mold, without the sellers resolving those problems after agreeing to do so.

85.     The Duseks relied on the Defendants' representations by signing the Buy-Sell Agreement, by signing the Inspection Notice, and by not affirmatively terminating the Buy-Sell Agreement earlier.

86.     As a direct result of the Defendants' misrepresentations, the Duseks incurred damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFOR, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. For a monetary judgment in an amount to be determined at trial;

2. For an award of attorneys' fees and costs of suit; and

3. For such other and further relief that the Court deems proper.

**JURY DEMAND**

Plaintiffs demand a jury on all counts so triable.

Dated this 29th day of April, 2024.

By:/s/ *Shane P. Coleman*
    Shane P. Coleman
    BILLSTEIN, MONSON & SMALL PLLC

    ATTORNEYS FOR PLAINTIFFS